**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION**

**WESTCHESTER FIRE INSURANCE COMPANY, a foreign corporation,**

**Plaintiff-Counter Defendant,**

**v.** **Case No.: 3:03cv188/MCR**

**PUNIT CORPORATION, a Florida corporation; and FIRST NATIONAL BANK NORTHWEST FLORIDA,**

**Defendants-Counterclaimants.**

**_____________________________________________/**

**O R D E R**

Before the court are the motions for summary judgment filed by plaintiff-counter defendant Westchester Fire Insurance Company ("Westchester") and defendant-counterclaimant Punit Corporation ("Punit").[1] As explained below, the court grants Westchester's motion for summary judgment on Punit's counterclaims and denies Punit's cross motion. In addition, the court defers ruling on Punit's motion for summary judgment on Westchester's claims and directs Westchester to file a response advising of its position on the status of those claims.

**BACKGROUND**

No material disputes appear to exist with respect to the following facts. In July 2001 Punit and River Valley Development, Inc., ("River Valley") entered into a contract in which

---

[1] See docket entries # 150, 158 (motions for summary judgment) and docket entries # 156, 160, 161, 162, 163, and 164 (documents in support of and in opposition to motions for summary judgment).

River Valley agreed to construct a Best Western motel for Punit at 2390 West Detroit Boulevard, Pensacola, Florida, at a cost of $1,800,000.00. Punit obtained financing for the project from defendant-counterclaimant First National Bank Northwest Florida ("First National"). Pursuant to a loan agreement dated September 5, 2001, First National made a construction mortgage loan to Punit in the amount of $2,269,500.00. (Doc. 150-2, Exh. A, "Construction Loan Agreement"). To secure the loan from First National, Punit executed a security agreement (doc. 150-2, exh. F, "Security Agreement") and an assignment of interest (doc. 150-2, exh. G, "Assignment of Mortgagor's Interest in Contract Documents" or "Collateral Assignment"), among other documents. In addition, Westchester, as surety for the project, issued a performance bond in the amount of $1,800,000.00 which named River Valley as principal and Punit and First National as dual obligees. (Doc. 99, Exh. B, "Performance Bond").

Construction of the motel commenced and continued until disputes arose between the parties which led to Punit's terminating River Valley as contractor on the project, effective October 14, 2002. Thereafter Punit made a claim to Westchester under the Performance Bond. Westchester investigated Punit's claim and made two proposals for completing construction of the motel, both of which proposals Punit rejected. On May 20, 2003, Westchester filed the instant action in which it alleged that Punit had unreasonably refused to accept its completion proposals and thus had breached the Performance Bond.[2] As relief, Westchester sought a judgment pursuant to 28 U.S.C. §§ 2201, 2202 which declared that it had fulfilled its obligations to Punit and First National under the Performance Bond, and it also sought exoneration from liability. Punit and First National answered and counterclaimed.

Following court-ordered mediation, in January 2004 the parties reached an agreement to complete construction of the motel. (Doc. 99, Exh. B, "Project Completion

---

[2] The action was filed pursuant to the court's diversity jurisdiction. According to the allegations of the complaint, Westchester was incorporated under the laws of the state of New York and, at all times material to this action, its principal place was located in Georgia; Punit was a Florida corporation and maintained its principal place of business in Florida; and First National was a national banking corporation or association having its principal place of business in Florida. The amount in controversy is alleged to exceed the sum of $75,000.00, exclusive of costs and interest.

Agreement"). In November 2004, however, other disputes connected with the project arose which culminated in Punit's firing the building contractor whom Westchester had engaged to complete construction of the project ("the completion contractor"). Subsequently, on April 4, 2005, Westchester filed the amended complaint which is presently before the court. (Doc. 99). In Count I Westchester reiterates its claim of breach of the Performance Bond and again seeks as relief a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 regarding its obligations and exoneration of liability. In Count II, alleging that Punit interfered with and delayed progress of the project, including firing the completion contractor, Westchester asserts a claim for breach of the Project Completion Agreement by Punit. As relief, Westchester seeks judgment against Punit for breach of the Project Completion Agreement; exoneration from any liability to Punit and First National under the Performance Bond and the Project Completion Agreement; and damages, in the form of attorneys' fees and costs pursuant to the Bond's terms, which resulted from Punit's breaches. Punit and First National answered the amended complaint and filed amended counterclaims in which each asserts that Westchester breached the Performance Bond and breached the Project Completion Agreement.

On October 20, 2003, First National filed a foreclosure action in state court alleging that Punit had defaulted on its loan obligations. First National was granted a final judgment of foreclosure by the state court on June 20, 2005. (Doc. 150-2, Exh. J). First National was issued an Amended Certificate of Title on December 5, 2005, which gave it, inter alia, possession of the property pledged by Punit for the construction loan, as set forth in the Security Agreement and Collateral Assignment. (Id., Exh. K). First National and Westchester settled their claims and counterclaims in a document executed December 13, 2005. (Doc. 163, Exh. 1). Pursuant to the terms of that agreement, First National transferred and assigned to Westchester its rights under the motel project's loan and contract documents as well as those rights it had obtained from Punit through foreclosure. In February 2006 Westchester and First National filed a joint motion for voluntary dismissal with prejudice of Westchester's claims against First National and First National's counterclaims against Westchester, which motion the court granted.

**DISCUSSION**[3]

Punit argues that it is entitled to summary judgment on its counterclaims because there are no disputed genuine issues of material fact regarding whether the conditions giving rise to Westchester's liability under the Performance Bond have been satisfied and whether Westchester has defaulted on its obligations.[4] Westchester submits that the documents on which Punit's counterclaim is based are part of the contract documents, as to which Punit pledged all of its rights as security for the loan it obtained from First National. And, Westchester contends, because the rights pledged by Punit subsequently were transferred to First National through foreclosure (and later to Westchester as part of the settlement agreement between Westchester and First National), under state law Punit no longer is the real party in interest or has standing to maintain its counterclaims. Westchester also argues that even if Punit had any remaining rights as to its counterclaims, numerous issues of disputed fact exist which preclude entry of summary judgment. In response to Westchester's argument that it lacks standing, Punit contends that it may proceed on its contract claims because the rights to causes of action arising from the Performance Bond were excluded as collateral under the Security Agreement. Alternatively, Punit asserts that in addition to its right to pursue the instant counterclaims it also possesses a right to make a claim for bad faith against Westchester at such time as Westchester's liability for breach has been determined. According to Punit, in light of

---

[3] Based on the undisputed allegations regarding the diverse citizenship of the parties and the amount in controversy, the court concludes that the statutory requirements of 28 U.S.C. § 1332 have been met as to both Westchester's claims and Punit's counterclaims. Further, the statutory requirements of 28 U.S.C. § 1367 appear to be satisfied because Punit's counterclaims against Westchester are compulsory in nature. See Fed.R.Civ.P. 13(a) (compulsory counterclaim is one that arises "out of the same transaction or occurrence that is the subject matter of the opposing party's claim"). See also Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, n.1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974). With respect both to diversity and supplemental jurisdiction, courts must apply state substantive law and federal procedural law. See Burke v. Smith, 252 F.3d 1260, 1265 (11th Cir. 2001) (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)); Lundgren v. McDaniel, 814 F.2d 600, 605 (11th Cir. 1987); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (indicating that the Erie doctrine applies to supplemental state claims litigated in federal courts).

[4] As indicated, Punit asserts two counts in its amended counterclaim, breach of the Performance Bond and the Project Completion Agreement. In its instant motion, however, Punit primarily addresses issues pertaining to the Performance Bond, making only limited reference to the Project Completion Agreement.

its prospective bad faith claim it has standing currently to maintain the contract-related counterclaims, which therefore are not moot.

"There can be no diversity jurisdiction in the absence of an Article III case or controversy." FMC Corp. v. Boesky, 852 F.2d 981, 992, n. 23 (7th Cir.1988) (stating that litigant must satisfy both Article III's case or controversy requirements and the statutory requirements for diversity jurisdiction in order to bring a diversity action in federal court). Therefore, in order to establish the federal court's jurisdiction the justiciability concerns of Article III, which include standing and mootness, must be satisfied. See Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 352 (3rd Cir. 1986) (stating that in diversity action the question of justiciability is a federal issue to be determined only by federal law); Bano v. Union Carbide Corp., 361 F.3d 696, 713-14 (2d Cir. 2004) (applying federal law of standing in a diversity action). See also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168 (2d Cir. 2005) (observing that where jurisdiction is predicated on diversity of citizenship, plaintiff must establish Article III standing in order to maintain a cause of action); Hutchinson v. Pfeil, 211 F.3d 515 (10th Cir. 2000) (noting that constitutional standing is a preliminary consideration in every case before a federal court, with diversity claims being no exception); Florida Association of Rehabilitation Facilities, Inc. v. Florida Department of Health & Rehabilitative Services, 225 F.3d 1208, 1227 n.14 (11th Cir. 2000) (stating that "mootness – like standing . . . raises . . . [a] basic question of jurisdiction that cannot be waived and goes to the very heart of the 'case or controversy' requirement of Article III"); Suarez Corp. Industries v. McGraw, 125 F.3d 222, 228 (4th Cir.1997) (indicating that "mootness goes to the heart of the Article III jurisdiction of the courts."). A federal court has a duty to examine its jurisdiction and to dismiss an action where jurisdiction is lacking. See Barnett v. Bailey, 956 F.2d 1036, 1039 (11th Cir. 1992); Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir. 1985).

The party seeking to invoke a federal court's jurisdiction bears the burden of establishing Article III standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Three elements must be demonstrated in order to establish Article III's standing requirements: (1) the plaintiff must have sustained an "injury

in fact," meaning "an invasion of a legally protected interest; (2) there must be a causal connection between the plaintiff's injury and the challenged conduct; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 560-61.

The doctrine of constitutional mootness is also rooted in Article III's "case or controversy" limitation because "an action that is moot cannot be characterized as an active case or controversy." Adler v. Duval County School Board, 112 F.3d 1475, 1477 (11th Cir. 1997); Sierra Club v. EPA, 315 F.3d 1295, 1299 (11th Cir. 2002) (stating that "[t]he rule that federal courts may not decide cases that have become moot derives from Article III's case and controversy requirement."). Indeed, constitutional concerns may preclude a court's consideration of cases no longer presenting a live issue. See, e.g., Preiser v. Newkirk, 422 U.S. 395, 401-04, 95 S.Ct. 2330, 2334-35, 45 L.Ed.2d 272 (1975). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). A case can become moot either "due to a change in [factual] circumstances, or . . . [due to] a change in the law." Coral Springs Street Systems, Inc. v. City of Sunrise, 371 F.3d 1320, 1328 (11th Cir. 2004). The court "simply does not have jurisdiction under Article III 'to decide questions which have become moot by reason of intervening events.'" Brooks v. Ga. State Bd. of Elections, 59 F.3d 1114, 1119 (11th Cir.1995) (citations omitted). Thus "[i]f events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001). Indeed, "dismissal is required because mootness is jurisdictional." Id. (citations omitted); Sierra Club, 315 F.3d at 1299 (stating that "[d]ismissal of a moot case is required because mootness is jurisdictional.").

The court notes that Punit does not dispute that it pledged the rights listed in the Security Agreement as collateral for the construction loan it obtained from First National or that it specifically assigned its rights in the contract documents to First National by executing the Collateral Assignment. Furthermore, Punit does not dispute that, through

foreclosure, any such rights it possessed were transferred to First National and subsequently to Westchester pursuant to the terms of its settlement agreement with First National. Rather, Punit asserts that First National "either excluded [a subsequent] cause of action from its security interest in the [S]ecurity [A]greement, or did not go far enough to perfect it in its [C]ollateral [A]ssignment." (Doc. 160 at 11). In support of its contentions, Punit points to the definitions section[5] and Paragraph 6[6] of Schedule A of the Security Agreement. According to Punit, "from a reading of the definitions contained in the Security Agreement, juxtaposed against the only effort to subject causes of action to a security interest [in Paragraph 6], it is apparent that the intangible right to causes of action arising from the Performance Bond are excluded therefrom, as the same are <u>intangible</u> personal property which do not pertain to or arise from the Property, Improvements, or Personal Property (as those terms are defined therein.)" (Doc. 160 at 10) (emphasis in original). In addition, Punit argues that because Paragraph 9 of Exhibit B of the Collateral Assignment fails to specifically identify causes of action, the assignment should not be read as including them.[7]

The court cannot accept Punit's arguments. Pursuant to the terms of the Security Agreement, including Schedule A, Punit granted First National a security interest in

---

[5] The definitions section states:

> [Definitions: As used herein, "Property" means the real property described in Exhibit "A" . . . . The term "Improvements" means any and all buildings and other improvements now or hereafter located on the Property or any part thereof. The term Premises" means the Property and the Improvements. The term "Personal Property" means all tangible personal property described below.]

(Doc. 150-2, Exh. F, Schedule A).

[6] Paragraph 6 of Schedule A refers to

> All contract rights . . . instruments, documents, general intangibles, chases in action, causes of action and other intangible personal property of the Debtor of every kind and nature whatsoever whether now existing or hereafter acquired, which pertain to, arise from or in connection with, or are related to the Property, the Improvements, the Fixtures, the Personal Property or the operation or use thereof . . . .

(Doc. 150-2, Exh. F, Schedule A at ¶ 6).

[7] Paragraph 9 of Exhibit B refers to "[a]ll payment and/or performance bonds now existing or hereafter entered into by [Punit] with respect to the construction of the Improvements." (Doc. 150-2, Exh. G, Exh. B at ¶ 9).

specified "property in which Punit Corporation, a Florida Corporation, Debtor, may now have or hereafter acquire any interest."[8] (Doc. 150-2, Exh. F, Schedule A, Introductory Paragraph) (emphasis added). Paragraph 6 of Schedule A specifically references the pledged intangible personal property, including all contract rights and causes of action, of "every" kind and nature and whether then existing or later acquired, which "pertain to, arise from or in connection with, or are related to the Property, the Improvements, the Fixtures, [or] the Personal Property . . . ." (Doc. 150-2, Exh. F, Schedule A at ¶ 6) (emphasis added); see also n.6, supra. The secured property also includes "[a]ll construction contracts and agreements, now or hereafter existing, relating in any way to the construction of the Improvements, including but not limited to that certain Construction Agreement dated July 10, 2001 . . ." between Punit and River Valley. (Id. at ¶ 7) (emphasis added). The language of Paragraphs 6 and 7, read in conjunction with the definition of terms section in Schedule A and other parts of the Security Agreement, clearly is broad enough to encompass, as secured interests, causes of action in contract arising under the Performance Bond and the Project Completion Agreement. The language also is sufficient to encompass other causes of action related to the construction of the motel, such as the claim of bad faith contemplated by Punit.

Punit contends that the Security Agreement excludes its intangible personal property interests in causes of action arising from the Performance Bond (and, presumably, the Project Completion Agreement). Punit notes that Schedule A defines "Personal Property" as including tangible personal property only and does not refer to intangible personal property. While Punit's observation is correct, it does not alter the conclusion that the Security Agreement includes the causes of action arising under the Performance Bond and the Project Completion Agreement at issue. Here, as discussed, the intangible personal property – in the form of the contract and/or tort causes of action

---

[8] While Punit disputes the interpretation of the terms of the Security Agreement (including Schedule A) and the Collateral Assignment (including Exhibit B to the Assignment) and maintains that they should be construed in its favor, Punit does not challenge the execution of these documents or the operability of any of their component parts.

– at the very least pertains to, arises from or is in connection with, or as Paragraph 6 more fully provides, "is related to" the Improvements, if not to the Property and the tangible personal property interests included within the definition of Personal Property.

Furthermore, even though Paragraph 9 of Exhibit B of the Collateral Assignment does not specifically mention causes of action, Punit's assignment to First National includes them. The Collateral Assignment describes the contract documents and states that Punit "unconditionally grants, transfers, and assigns" to First National "all" of Punit's right, title, and interest in those documents.[9] (Doc. 150-2, Exh. G, ¶ 1). In addition, the Assignment provides that Punit "grants to [First National], its successors and assigns, a security interest in such Contract documents, and all rights and privileges of any nature thereunder accruing . . . ." (Id.) (emphasis added). Moreover, Exhibit B of the Collateral Assignment references "[a]ll construction contracts and agreements, now or hereafter existing, relating in any way to the construction of the Improvements, including without limitation that certain construction contract" between Punit and River Valley.[10] (Id. at Exh.

---

[9] According to the first paragraph of the Collateral Assignment, Punit

> unconditionally grants, transfers, and assigns to [First National], its successors and assigns, all of the right, title, and interest of [Punit] in and to the Contract documents, and grants to [First National], its successors and assigns, a security interest in such Contract documents, and all rights and privileges of any nature thereunder accruing . . . .

(Id., ¶ 1).

[10] Punit relies heavily on Blanchard v. State Farm Mutual Automobile Insurance Company, 575 So.2d 1289 (Fla. 1991), in support of its argument that it retains standing to pursue a bad faith claim. In Blanchard, answering a question of Florida law which had been certified by the Court of Appeals for the Eleventh Circuit, the Florida Supreme Court held that the insured's claim pursuant to Fla. Stat. § 624.155(1)(b)(1), against an uninsured motorist carrier for failing to settle the claim in good faith did not accrue before the conclusion of the underlying litigation for the contractual uninsured motorist insurance benefits. Id. at 1291. In the instant case, however, Punit no longer possesses any interests under the Performance Bond (or the Project Completion Agreement), which would include the right to bring a claim for bad faith.

In any event, though not considered in connection with the instant determination of mootness, the court notes with interest the following matters. First, the issue of whether, under Fla. Stat.§ 624.155(1)(b)(1) (1999), the obligee of a surety contract is considered an insured such that the obligee may sue the surety for bad faith remains pending before the Florida Supreme Court, see Dadeland Depot, Inc. v. St. Paul Fire and Marine Insurance, Case No. SC04-1828, upon the Eleventh Circuit's certified question. See Dadeland Depot, Inc. v. St. Paul Fire and Marine Insurance, 383 F.3d 1273 (11th Cir. 2004). Second, the Florida legislature amended § 624.155 in 2005 to exclude claims of bad faith against sureties. See Fla. Stat. § 624.155(9)(2005) (providing that "[a] surety issuing a payment or performance bond on the construction or maintenance of a building or roadway project is not an insurer for purposes of subsection (1)").

B, ¶ 1) (emphasis added).

In short, the court concludes that Punit currently does not possess the right to maintain claims of breach of the Performance Bond or breach of the Project Completion Agreement. Nor does Punit retain any prospective right to pursue a claim of bad faith against Westchester. According to Westchester, under state law Punit's motion therefore should fail because Punit no longer has standing to pursue its counterclaims. The court, however, perceives the issue as preliminarily, and more properly, involving the doctrine of mootness which should be addressed under principles of federal constitutional law. See Federal Kemper Ins. Co. 807 F.2d at 352 (providing that federal court's diversity jurisdiction is established only if justiciability concerns of Article III are satisfied, a matter which is to be determined by federal law). A party's standing to sue is generally measured at the time the complaint is filed; the effect of subsequent events generally is analyzed under mootness standards. See Johnson v. Board of Regents of University of Georgia, 263 F.3d 1234 (11th Cir. 2001); Moyer v. Walt Disney World Co., 146 F.Supp.2d 1249 (M.D.Fla. 2000) (noting that existence of standing must be determined as of the date suit is filed and the requisite personal interest that must exist at the commencement of the litigation must continue throughout its existence or the matter becomes moot); see also Arizonans for Official English v. Arizona, 520 U.S. 43, 68, n.22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)' ") (internal citations omitted)).

With respect to the instant matter, First National was issued an Amended Certificate of Title on December 5, 2005, which divested Punit of the property it had pledged for the construction loan, including its rights to the causes of action at issue in this case. Prior to this date, Punit held a personal stake in the outcome of the proceedings such that it possessed standing to pursue its counterclaims.[11] Nevertheless, because subsequently

---

[11] The record reflects that Westchester initiated this case on May 20, 2003, and filed its amended complaint on April 4, 2005. Punit initially filed its counterclaim on June 16, 2003, and filed its amended counterclaim on April 18, 2005.

occurring events have deprived Punit of the right to pursue claims against Westchester under the Performance Bond (and Project Completion Agreement) and Punit therefore no longer has a legally cognizable interest in the outcome of the counterclaims, the court finds that Punit's counterclaims are moot.[12] See Powell, 395 U.S. at 496. Punit's counterclaims thus are due to be dismissed for lack of subject matter jurisdiction. See Al Najjar, 273 F.3d at 1336; Sierra Club, 315 F.3d at 1299.

Additionally, the court notes that justiciability doctrine encompasses more than the question of whether it has power under Article III to decide a particular case. Prudential considerations may also counsel against the use of judicial power even when its constitutionality is established. See, e.g., Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In the instant case, the court concludes that Punit's counterclaims should be deemed moot not only based on Article III concerns but also for prudential reasons. See Ali v. Cangemi, 419 F.3d 722 (8th Cir. 2005) (describing, in addition to Article III mootness, the second "variety" of mootness known as prudential mootness, which "is a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration") (citation omitted); see also National Iranian Oil Co. v. Mapco International, Inc., 983 F.2d 485, 490 (3rd Cir. 1992) (indicating that mootness doctrine incorporates not only the threshold constitutional requirement of a live case or controversy, but also prudential concerns such as judicial economy). Regardless of whether the court has jurisdiction under Article III as to Punit's counterclaims, the prudential concerns of efficient judicial administration and economy militate against the exercise of its judicial power to decide claims as to which Punit no longer has any cognizable interest.

**CONCLUSION**

For the reasons previously explained, the court grants Westchester's motion for summary judgment on Punit's counterclaims because the counterclaims are moot, and it

---

[12] This case does not implicate any of the following exceptions to the mootness doctrine: (1) where there is an issue capable of repetition, yet evading review; (2) the appellant has taken all necessary steps to perfect the appeal and to preserve the status quo; and (3) there are collateral legal consequences that survive after plaintiff's primary injury has been resolved. See Bekier v. Bekier, 248 F.3d 1051, 1054, n.4 (11th Cir. 2001).

denies Punit's cross motion. Punit's counterclaims are dismissed with prejudice. See Wright and Miller, Federal Practice and Procedure, § 3533.5 (2d Supp. 2005) (indicating that if defendant can never again engage in the challenged conduct, the action is permanently moot.). In addition, as it appears that Westchester's claims may no longer present live issues as to which the court can grant meaningful relief, Westchester' claims likewise may be moot.[13] Ruling on Punit's motion for summary judgment on Westchester's claims therefore is deferred. Within ten (10) days Westchester shall advise the court of its position on the status of its claims against Punit. Westchester's request for oral argument on its motion for summary judgment is denied as moot.

It is therefore ORDERED:

1. The motion for summary judgment filed by plaintiff-counter defendant Westchester Fire Insurance Company on defendant-counterclaimant Punit Corporation's counterclaims (doc. 150) is GRANTED and Punit's Corporation's cross motion on the counterclaims (doc. 158) is DENIED. Punit Corporation's counterclaims are DISMISSED with prejudice.

---

[13] As Westchester notes, because "Punit no longer is an obligee" under the Performance Bond and "as a result of the full and complete settlement and release of liability between Westchester and the only remaining obligee under the bond, there are no remaining rights or potential claims against Westchester in favor of any party under the bond." (Doc. 163, n.1). Thus the declaratory relief sought in Count I of Westchester's amended complaint appears to have been rendered moot. See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 212-13, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (holding that in order to avoid advisory opinions, a court may not hear a case if the underlying dispute loses its character as a present, live controversy); Moongate Water Co. v. Dona Ana Mut. Domestic Water Consumers Association, 420 F.3d 1082, 1088 (10th Cir. 2005) (noting that mootness principles apply to claims brought under the Declaratory Judgment Ac). The court also notes that it is well-settled that the Declaratory Judgment Act is properly "understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). The Supreme Court in fact has "repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Id. at 287 (citations omitted). Indeed, as recently noted by the Eleventh Circuit, the Act "only gives the federal courts competence to make a declaration of rights; it does not impose a duty to do so." Ameritas Variable Life Insurance Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005). See also State Auto Insurance Companies v. Summy, 234 F.3d 131, 136 (3rd Cir. 2000) (stating that "[t]he desire of insurance companies . . . to receive declarations in federal court on matters of purely state law has no special call on the federal forum.").

Moreover, with the possible exception of Westchester's claim for damages in Count II, it appears that Westchester does not seek – and may not obtain – any other relief as to this claim which may be described as "meaningful" or which triggers an exception to the mootness doctrine. Count II therefore may also be moot.

2. Ruling on Punit's motion for summary judgment on Westchester's claims is DEFERRED.

3. Within ten (10) days Westchester shall advise the court of its position on the status of its claims against Punit, in a document which shall not exceed ten pages in length. If it so chooses, Punit may also be heard on this matter by responding in writing, with the same restrictions as to length and subject of the response and time for filing.

4. Westchester's request for oral argument on its motion for summary judgment on Punit's counterclaims is DENIED as moot.

**DONE and ORDERED** this 19th day of December, 2006.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**